## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## ST. JOSEPH DIVISION

MARK A. OLSON,                    )
                                 )
      Plaintiff,              )
                                 )
v.                               )     Case No. 5:14-cv-06065-NKL
                                 )
CAROLYN W. COLVIN,               )
Acting Commissioner              )
of Social Security,              )
                                 )
      Defendant.              )

## ORDER

Before the Court is Mark Olson's appeal of the Commissioner of Social Security's final decision denying his application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. [Doc. 5]. For the following reasons, the Commissioner's decision is reversed in part, and the case is remanded for further consideration consistent with this Order.

## I. Background

Olson was born in February 1971, has some college education, and has past work experience as a service station night clerk and manager, delivery truck driver, truss builder, probation assistant, call center worker, casino dealer, bus driver, and maintenance worker. Olson alleges a disability onset date of May 1, 2008, from the combined effects of carpal tunnel syndrome post bilateral arm fractures, residual

cognitive disorders post skull fracture, affective disorder, Type II diabetes mellitus, hypertension, and obesity.  [Doc. 5, p. 1].

### A.  Medical History

In May 1989, Olson was involved in a car accident.  [Tr. 260].  He was ejected from the vehicle and was unconscious.  He eventually regained all major functional abilities.  *Id.*  Olson sought vocational services in 2006 and underwent a neuropsychological evaluation.  *Id.* at 259.  The psychologist concluded that Olson had a full scale IQ in the high average range and demonstrated strengths across all domains, but while his overall memory was intact, he demonstrated specific relative memory weaknesses. [Tr. 262, 265].  His immediate memory capabilities were lower than expected relative to his overall intellectual functioning. [Tr. 263].

In April 2008, Olson sustained a second head injury following a fourteen to eighteen foot fall off his roof.  [Tr. 339-42].  He landed on his outstretched arms and sustained bilateral wrist fractures, a skull fracture, bilateral nasal fractures, and fractures to both eye sockets.  [Tr. 254].  CT scans showed a subarachnoid hemorrhage, a possible cerebrospinal fluid leak, and a nondisplaced skull base fracture.  [Tr. 346, 362].  Olson underwent reconstructive surgery on May 9, 2008, to repair the fractures in his arms, and implants were placed in his wrists.  By September 2008, Olson reported that his right wrist was back to pre-injury status, but that he continued to experience numbness in his left hand and fingers which interfered with fine motor skills.  [Tr. 281]. The doctor opined that Olson could "begin activity as tolerated of his bilateral upper extremities."

*Id.* Olson still required assistance from his wife at home due to numbness. *Id.* Olson's wrist implants were removed in December 2008. [Tr. 311].

In January 2012, Olson was involved in another car accident. [Tr. 329]. He complained of a severe headache and a sore left shoulder. A CT scan of his head revealed no hemorrhage, but did reveal residual low attenuation involving the inferior right frontal lobe white matter which had decreased since his last CT scan in May 2008. [Tr. 325-26]. Five months later, in May 2012, Olson complained of increasingly severe memory loss. [Tr. 444]. An MRI revealed scattered white matter changes, evidence of abnormal signal and volume loss in the frontal lobes and scattered other signal abnormalities, suggesting trauma. [Tr. 443-44]. Also in May 2012, at the request of the Missouri Department of Social Services, Dr. Michael Schwartz, Ph.D., performed a psychological evaluation. The results of a Wechsler Memory Scale – IV examination revealed that Olson was functioning in the average to above average range of memory ability. [Tr. 449].

In early October 2012, Olson was diagnosed with anxiety, depression, and mood swings. [Tr. 507]. In mid-October 2012, Olson was admitted to the hospital after attempting to commit suicide by overdosing. [Tr. 646, 676]. He remained in the hospital for three days and was discharged with diagnoses of bipolar and adjustment disorders. *Id.* Olson began psychiatric treatment in April 2013. Examinations in April and May 2013 revealed a depressed mood, a restricted affect and psychomotor symptoms, fair insight and judgment, anxiety, dysthymia, and distractability. [Tr. 494-97].

On May 13, 2013, Dr. James Applebaum, M.D., stated that Olson scored 28/30 on a mini-mental state examination, losing 1 point for orientation and 1 point for 3-minute recall. [Tr. 519]. Olson had symptoms of frontal lobe dysfunction, but "actually [did] quite well on bedside mental-status testing." [Tr. 519]. Dr. Applebaum referred Olson to Dr. Neal Deutch, Ph.D., for neuropsychological testing. On May 20 and June 13, 2013, Dr. Deutch conducted a neuropsychological assessment, the results of which are discussed in more detail in Part III.B. [Tr. 526-38].

**B. Medical and Third-Party Opinions**

The record contains medical opinions related to Olson's functional limitations. In May 2012, Dr. Schwartz, after conducting a Wechsler Memory Scale – IV examination, opined that Olson may have "some slight impairment in executive function . . . but this does not appear to be severe." [Tr. 449]. Dr. Schwartz "did not detect any cognitive, memory, or emotional problems which would prevent [Olson from] working." [Tr. 450].

In June 2013, Dr. Applebaum completed a Medical Source Statement-Mental. [Tr. 523-24]. Dr. Applebaum opined that Olson was markedly or extremely limited in all categories of understanding and memory and sustained concentration and persistence, except he was moderately limited in his ability to make simple work related decisions. [Tr. 523-24]. Olson was, at most, moderately limited in all areas of social interaction and adaptability, except he was markedly limited in his ability to set realistic goals or make plans independently of others. [Tr. 524].

In July 2013, Dr. Deutch completed a Medical Source Statement-Mental. [Tr. 540-41]. Dr. Deutch opined that Olson was mostly moderately limited in all areas of

4

understanding and memory, sustained concentration and persistence, and social interaction. *Id.* Olson had no limitations in adaptability. [Tr. 541]. However, Olson was markedly limited in his ability to understand and remember detailed instructions, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruption from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. [Tr. 540-41]. Dr. Deutch also submitted a medical statement related to Olson's depression. [Tr. 543-45]. Dr. Deutch opined that Olson had pervasive loss of interest in almost all activities, sleep disturbances, psychomotor agitation or retardation, difficulty concentrating or thinking, and thoughts of suicide. [Tr. 543]. Olson had mild restrictions of activities of daily living (ADLs) and moderate difficulty in maintaining social functioning. Deficiencies of concentration, persistence, and pace as well as repeated episodes of deterioration or decompensation in work or work-like settings were present. Olson was either not significantly impaired or moderately impaired in all work limitation categories, except that he was markedly impaired in his ability to accept instructions and respond appropriately to criticism from supervisors. [Tr. 544-45].

The record also contains non-medical, third-party statements from Olson's wife and his vocational rehabilitation counselor. In July 2008, Olson's vocational rehabilitation counselor, Ms. Deborah Fannon, stated that Olson had cognitive and manipulative impairments. [Tr. 251]. He had diplopia, short term memory difficulties, depressed mood, low frustration tolerance, anger management problems, fatigue, and

5

inappropriate guild.  He had functional limitations with manual dexterity in both hands, repetitive movements of the hands, lifting, fingering, and grip strength. *Id.*

In April 2012, Olson's wife, Mrs. Sarena Olson, completed a Third-Party Adult Function Report. [Tr. 205-12].  Mrs. Olson stated that Olson needed constant reminders to take his medication, attend medical appointments, pay bills, cook meals, and complete chores and other tasks.  He was able to supervise his children, who were self-sufficient, care for his dogs with reminders, and grocery shop once a week.  Olson struggled in large groups and became embarrassed when he could not recall words.  He obsessed over small things, was easily distracted, and followed instructions poorly.  He had difficulty understanding, talking, seeing, using his hands, following instructions, completing tasks, getting along with others, memory, and concentration. [Tr. 210].  Mrs. Olson explained that prior to falling off his roof, Olson was the breadwinner of the family and was performing above average in college classes.  After the roof accident, his grades dropped and he failed tests. [Tr. 212].  Mrs. Olson analogized Olson's behavior to that of a person suffering from dementia.  He had difficulty recalling recent events, finding words to describe feelings or objects, carrying out tasks, and making decisions.  [Tr. 213].  He was depressed, anxious, agitated, and full of rage.  *Id.*  Mrs. Olson wrote that his symptoms "impacted every area of his life, including [his] marriage."  *Id.*

### C. ALJ's Decision

After a hearing, the ALJ concluded that Olson suffered the following severe impairments:  carpal tunnel syndrome, status post skull fracture with cognitive disorders, status post arm factures, and affective disorder. [Tr. 17].  Olson had the residual

6

functional capacity (RFC) to stand, walk, or sit six hours in an eight hour day, push or pull fifty pounds occasionally and twenty-five points frequently, occasionally perform fine manipulation with both hands, and frequently perform gross manipulation with both hands. [Tr. 20]. He could perform moderately complex instructions and tasks at a SVP level 5 rating, could have occasional contact with coworkers, supervisors, and the general public, and his primary job duties could not include general public interaction. *Id.* He should work in socially isolated work settings. *Id.* Based on the testimony of a vocational expert (VE), the ALJ concluded that Olson could perform past relevant work as a truss builder or delivery truck driver, or alternatively, could perform other work that existed in significant numbers in the national economy, including as an industrial cleaner, landscape specialist, or electrician helper. [Tr. 24-25].

In making his conclusion, the ALJ gave "great weight" to the portion of Dr. Applebaum's opinion stating Olson could occasionally perform fine manipulation and frequently perform gross manipulation. [Tr. 23]. The ALJ afforded "little weight" to the portion of Dr. Applebaum's opinion stating that Olson was markedly limited in his ability to understand, remember, and carry out very short and simple instructions. *Id.* The ALJ also gave "little weight" to the Medical Source Statement-Mental completed by Dr. Deutch. *Id.* The separate report submitted by Dr. Deutch was also given "little weight." *Id.* No weight was assigned to the report of Dr. Schwartz. The ALJ did not discuss or weigh third-party reports submitted by Olson's wife or Olson's vocational rehabilitation counselor. The ALJ also concluded that Olson was not entirely credible. [Tr. 21].

## II. Discussion

7

Olson argues that the Commissioner's decision is not supported by substantial evidence in the record as a whole because (1) the ALJ's credibility determination is based solely on the lack of objective medical evidence; (2) the weights given to the medical opinions in the record are not supported by substantial evidence; (3) the RFC is not supported by medical evidence; (4) the ALJ did not acknowledge or discuss statements submitted by Olson's wife and his vocational rehabilitation counselor; (5) at Step 4, the ALJ did not make explicit findings related to the physical and mental demands of Olson's past work; and (6) at Step 5, the ALJ selected jobs existing in significant numbers in the national economy that are precluded by the ALJ's RFC determination.

## A. Credibility

Olson argues the ALJ's determination that he was "not entirely credible" is not supported by substantial evidence in the record as a whole because it is based solely on the lack of objective medical evidence to support Olson's allegations. "It is well-settled than an ALJ may not discount a claimant's allegations of disabling [symptoms] solely because the objective medical evidence does not fully support them." *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005). Instead, the ALJ must acknowledge and consider the claimant's prior work history, daily activities, the duration, frequency and intensity of the symptoms, the dosage, effectiveness and side effects of medications, precipitating and aggravating factors, and functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984). While the ALJ need not explicitly discuss each *Polaski* factor, he should acknowledge and consider those factors before discounting a claimant's subjective complaints. *Goff*, 421 F.3d at 785.

In his decision, the ALJ stated that Olson's statements concerning the intensity, persistence and limiting effects of his symptoms were "not entirely credible for the reasons explained in this decision." [Tr. 21]. The ALJ does not cite *Polaski* in his decision and does not acknowledge or discuss the *Polaski* factors in the decision. The Commissioner argues the ALJ addressed the relevant evidence when determining Olson's credibility, including "the medical records, inconsistencies in Olson's testimony, his rigorous daily activities, and the medical opinions." [Doc. 8, p. 11]. The Commissioner does not cite to any examples in the decision where the ALJ pointed to inconsistencies in Olson's testimony or to "rigorous daily activities."

Nonetheless, a review of the ALJ's decision reveals that the ALJ did discuss certain inconsistencies and Olson's ADLs throughout his decision. But it is unclear whether these inconsistencies and ADLs were actually relied upon by the ALJ in making a credibility analysis, because the ALJ does not link his credibility analysis to any specific findings within his decision. Further, even if it was clear that the ALJ considered inconsistencies and Olson's ADLs in making his credibility analysis, the ALJ's discussion of the inconsistencies and ADLs is not supported by substantial evidence. For example, the ALJ pointed out that Olson complained of panic attacks but that Olson also stated he enjoys visiting friends and functions "pretty good" overall. [Tr. 22]. However, Olson testified that he only suffered panic attacks in populated settings like a school graduation and while grocery shopping, so testimony that he spent time with friends is not inconsistent with complaints of panic attacks in populated areas. [Tr. 54-55]. The ALJ also pointed out that while Olson complained of debilitating memory loss, he was

9

able to complete college courses after his alleged onset date and was able to rebuild his transmission. Yet, in an Adult Function Report that the ALJ did not acknowledge in his decision, Olson's wife stated that after his roof accident (and the onset date), Olson continued to take college courses, but that he could not pass tests, his grades dropped, he required her help with homework, and he eventually dropped out. [Tr. 212]. The ALJ did not question Olson about the extent of his college classes at his hearing. Further, while the ALJ stated that Olson rebuilt his transmission, the evidence relied upon by the ALJ states that he "basically" rebuilt his transmission himself, but that he did receive some help from a friend. [Tr. 449]. While this is some evidence of an ability to work, there is no evidence regarding how long this process took, whether Olson relied on his friend for memory prompts, and whether Olson's ability to do this is evidence that he can independently perform "moderately complex instructions and tasks" on a daily basis in a competitive work environment. [Tr. 20]. Again, the ALJ did not question Olson about this endeavor to learn the circumstances around it.

The ALJ also listed Olson's ADLs throughout the decision. The ALJ stated Olson could make coffee, perform indoor and outdoor chores, watch television, take his kids to school, take care of his dogs, cook meals, pay bills, drive, shop, and spend time with others. [Tr. 18]. However, the same document cited by the ALJ when listing Olson's ADLs – Olson's Adult Function Report – elaborates on his ability to do these tasks. Olson states, "I am constantly forgetting to do things and forgetting to finish things that I have started." [Tr. 215]. He can cook "basic recipes requiring few steps because I will sometimes forget a step or leave the stove on." [Tr. 217]. He is able to do all indoor and

outdoor chores, but "my problem is I start one thing and forget I am doing it until I am in the middle of something else." *Id.* He works "all day, every day doing simple chores and very seldom [does he] ever get things done." *Id.* He pays bills, but elaborates later that he is unable to pay bills because he does not "remember to make payments" and if he does, he forgets "how much paid to whom." [Tr. 218]. Olson stated:

> My days begin with good intentions. I want to work hard and finish my list of chores for the day. Unfortunately my days almost always end with me getting very few things finished. I used to go to work and provide for my family and now I can't even get a sink full of dishes done without getting distracted and forgetting what I am doing.

[Tr. 222]. These statements are also consistent with Mrs. Olson's statements, which were not discussed in the ALJ's decision. Mrs. Olson stated that "he putters around the house trying to complete one task or another, rarely completing them." [Tr. 205]. Olson could make "simple one step things unless [she] is there to remind him that stuff is cooking." [Tr. 207]. He attempts basic chores "with reminding and cuing" but they are "often incomplete." *Id.* Olson "forgets to pay bills even with reminders [and is] unable to remember to enter entries into the checkbook." [Tr. 208].

The ALJ did not acknowledge or list any of the *Polaski* factors in his decision. Even if he did rely on inconsistencies within Olson's statements and Olson's ADLs in making a credibility determination – which is unclear – the ALJ did not provide a complete picture of the inconsistencies and ADLs described in his decision. Rather, it appears the ALJ picked portions of the record consistent with an unfavorable finding while disregarding evidence such as Olson's work history prior to his onset date and his

11

wife's testimony that he required constant reminders to complete even simple tasks. Remand is necessary so that the ALJ can conduct a credibility analysis that is consistent with the factors in *Polaski* and supported by substantial evidence in the record as a whole.

## B. Weight Given to Medical Opinions

Olson also argues the weights given to the medical opinions in the record are not supported by substantial evidence. First, the ALJ gave "great weight" to the portion of Dr. Applebaum's opinion stating Olson could occasionally perform fine manipulation and frequently perform gross manipulation. The portion of Dr. Applebaum's opinion stating that Olson was markedly limited in his ability to understand, remember, and carry out very short and simple instructions was given "little weight" because the opinion was inconsistent with his treatment notes, with the findings of the psychological consultative examination, and with Olson's testimony that he completed college courses and rebuilt a transmission after the alleged disability onset date. [Tr. 23].

The weight given to Dr. Applebaum's opinion is supported by substantial evidence. Dr. Applebaum opined that Olson was markedly or extremely limited in almost all areas of understanding and memory and sustained concentration and persistence. [Tr. 523]. However, one month earlier, Applebaum stated that Olson scored 28/30 on a mini-mental state examination and "actually does well on bedside mental-status testing," [Tr. 519]. Dr. Applebaum's opinion is also inconsistent Dr. Deutch's July 2013 opinion that Olson was mostly moderately limited but markedly limited in a few areas, [Tr. 540-51]. The opinion is also inconsistent with a May 2012 neuropsychological examination which found that Olson was "functioning in the average

12

to above average range of memory ability." [Tr. 449]. That Olson was markedly limited in his ability to remember and carry out even simple instructions is also inconsistent with his ability to "basically" build a transmission or attend college courses.

Next, the ALJ gave "little weight" to a Medical Source Statement-Mental completed by Dr. Deutch because the opinion is not supported by evidence in the record or Dr. Deutch's clinical assessment of him. To the contrary, Dr. Deutch's opinion is supported by both the evidence in the record and his own assessment. Dr. Deutch opined that Olson was mostly moderately limited in understanding and memory and sustained concentration and persistence. However, Olson was markedly limited in his ability to understand and remember detailed instructions, his ability to work in coordination with or proximity to others without being distracted by them, his ability to complete a normal workday and workweek without interruption from psychologically based symptoms, and his ability to perform at a consistent pace without an unreasonable number and length of rest periods. These findings are consistent with Dr. Applebaum's statement that Olson lost a point on the mini-mental state examination for 3-minute recall, [Tr. 519]. They are also consistent with Olson's testimony and the Adult Function Reports submitted by both Olson and his wife. Olson's vocational rehabilitation counselor, Ms. Fannon, also opined in July 2008 that Olson suffered from short term memory difficulties. [Tr. 251]. In determining that Olson was eligible for vocational rehabilitation, Ms. Fannon checked boxes including, "change in regular occupation is required," "inability to perform regular occupation," and "disability interferes with preparation for an occupation commensurate with capacities and abilities." *Id.*

Dr. Deutch's opinion is also consistent with detailed objective testing he performed on Olson. Objective examination results revealed that while Olson performed "average" on many tasks, he struggled with delayed memory. The results suggested a decline in delayed memory, "indicating forgetting and difficulty with consolidation and storage." Auditory and delayed memory were below expectations, and auditory memory was "meaningfully lower in comparison with general ability." [Tr. 536]. Recognition memory was "extremely low," and Olson experienced "deficits in remembering the context or source of verbal information." *Id.* These test results are consistent with Dr. Deutch's opinion that Olson was moderately limited in his ability to understand and remember very short and simple instructions but markedly limited in his ability to understand and remember detailed instructions. Despite these findings, the ALJ concluded that Olson could perform "moderately complex instructions and tasks." [Tr. 20]. The results also revealed that Olson suffered moodiness and lability with fairly rapid and extreme mood swings. [Tr. 534]. This finding is consistent with Dr. Deutch's opinion that Olson was markedly limited in his ability to complete a normal workday or workweek without interruption from psychologically based symptoms. [Tr. 541].

The ALJ also stated that Dr. Deutch's opinion "appears [to be] based heavily on the subjective report of symptoms and limitations provided by the claimant." [Tr. 23]. Likewise, a separate report submitted by Dr. Deutch was also given "little weight" because the form "appears to have been completed as an accommodation to the claimant and includes only conclusions regarding functional limitations without any rationale for those conclusions." *Id.* However, neither the ALJ nor the Commissioner offers any

14

evidence to support the assumption that Dr. Deutch's opinions were based on subjective complaints. Rather, as discussed above, Dr. Deutch's opinion is not only consistent with Olson's and his wife's reports, but it is also consistent with Ms. Fannon's opinion, poritons of Dr. Applebaum's opinion, and objective examination results revealing that Olson had particularly low performance in certain areas of memory.

Finally, despite apparently relying on the 2012 neuropsychological report and opinion authored by Dr. Michael Schwartz to discount Dr. Applebaum's opinion and to conclude that Olson could perform "moderately complex instructions and tasks," the ALJ did not provide any weight to Dr. Schwartz's opinion, nor did he provide reasons for his reliance on Dr. Schwartz's opinion over Dr. Applebaum's or Dr. Deutch's more recent opinions. On remand, the ALJ must weigh Dr. Deutch's and Dr. Schwartz's opinions and provide reasons for those weights which are supported by substantial evidence in the record as a whole.

### C. Whether the RFC is Supported by Some Medical Evidence

Olson argues that because the ALJ assigned "little weight" to every medical opinion in the record, the ALJ's RFC determination that Olson can perform "moderately complex tasks and instructions" is not supported by medical evidence. The ALJ's RFC determination related to Olson's memory is supported by Dr. Schwartz's opinion that Olson scored in the average to above average range of memory ability and that Olson did not have any cognitive, memory, or emotional problems which would prevent him from working. [Tr. 449-50]. However, Dr. Deutch's opinions and examination findings, which occurred more recently, are inconsistent with Dr. Schwartz's opinion. This

15

discrepancy is concerning because the ALJ's reasons for giving Dr. Deutch's opinion "little weight" were not supported by substantial evidence in the record. Moreover, the ALJ did not weigh Dr. Schwartz's opinion or provide reasons for his reliance on that opinion over Dr. Deutch's opinion. Remand is necessary so that the ALJ may not only weigh Dr. Schwartz's and Dr. Deutch's opinions and provide reasons for those weights which are supported by substantial evidence, but also so that the ALJ may resolve the conflict between Dr. Scwartz's findings and opinion and Dr. Deutch's more recent findings and opinions. To resolve the discrepancy, it may be necessary to order additional medical evidence addressing how, if at all, Olson's auditory and delayed memory impairments would affect his ability to sustain competitive employment.

Olson also contends that the record contains no medical opinions regarding Olson's physical limitations. To the contrary, in determining that Olson could occasionally perform fine manipulation with both hands and frequently perform gross manipulation with both hands, the ALJ gave "great weight" to a separate opinion from Dr. Applebaum. [Tr. 23]. Dr. Applebaum submitted a medical statement "regarding hand and wrist problems" where he opined that Olson suffered from mild wrist pain but could occasionally perform fine manipulation with both hands and frequently perform gross manipulation with both hands. [Tr. 521]. The ALJ adopted these statements in the RFC. The ALJ's RFC determination is also consistent with Olson's statement that his right hand was functioning at pre-injury capacity and that he still experienced some numbness in his left fingers which interfered with fine manipulation. [Tr. 281].

**D. Third-Party Statements**

16

Olson next asserts that the ALJ's RFC determination is not supported by substantial evidence in the record because the ALJ did not acknowledge, discuss, or weigh the third-party opinions of his wife and vocational rehabilitation counselor. "Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," the Social Security Administration states it "will carefully consider any other information" a claimant submits about his symptoms, including information provided by other persons. 20 C.F.R. § 404.1529(c)(3). "In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including . . . statements and other information provided by . . . other persons about the symptoms and how they affect the individual . . . ." SSR 96-7P, 1996 WL 374186 (S.S.A. 1996). However, the Eighth Circuit, in *Buckner v. Astrue*, 646 F.3d 549, 559-60 (8th Cir. 2011), has held that even when an ALJ does not acknowledge or discuss lay opinions in his decision, remand is not required when the same evidence used to discredit the claimant's statements can be used to discredit the layperson's statements. *See Buckner*, 646 F.3d at 559-60.

Unlike in *Buckner*, where the Eighth Circuit determined that the ALJ had "sufficiently assess[ed] [the claimant's] credibility" and that the same credibility analysis could be applied to statements from the claimant's girlfriend, *id.*, the ALJ in this case did not conduct a proper credibility analysis, as discussed above. Had the ALJ made a credibility determination supported by substantial evidence in the record as a whole, the ALJ's failure to discuss opinions from Mrs. Olson and Ms. Fannon may have been excusable under *Buckner*. But here, statements from Mrs. Olson and Ms. Fannon

17

corroborate Olson's testimony and the Medical Source Statement from Dr. Deutch regarding a specific type of memory impairment. In fact, many of the daily activities relied upon by the ALJ in his decision were more restrictive than represented by the ALJ, and Olson's statements about those restrictions are corroborated by Mrs. Olson's statements. Moreover, Ms. Fannon,[1] as a rehabilitation counselor, is an "other source" who has worked with Olson in her professional capacity, and her opinion should be evaluated using the factors described in SSR 06-03P. *See* SSR 06-03P, 2006 WL 2329939 (S.S.A. 2006). On remand, the ALJ shall discuss and weigh both Mrs. Olson's and Ms. Fannon's statements.

### E. Findings Related to Olson's Past Work at Step 4

At Step 4 of the evaluation process, the ALJ determined that Olson could perform past work as a truss builder and delivery truck driver as he actually performed them and as those jobs are generally performed in the national economy. [Tr. 24]. However, deficiencies in the credibility, medical opinion, and third-party opinion analyses aside, the ALJ's Step 4 analysis is not supported by substantial evidence. At the fourth step in the disability evaluation process, an "ALJ has a duty to *fully* investigate and make *explicit* findings as to the physical and mental demands of a claimant's past relevant work and to compare that with what the claimant [himself] is capable of doing before the ALJ determines that [he] is able to perform [his] past relevant work." *Young v. Astrue*, 702

---

[1] Olson also argues that Mrs. Olson's opinion should be considered as an "other medical source" because she is a registered nurse. However, the Adult Function Report submitted by Mrs. Olson, other than analogizing Olson's symptoms to those exhibited by a dementia patient, does not focus on an examining or treatment relationship, nor does it relate to Mrs. Olson's treatment of Olson in her professional capacity. Rather she discusses their personal relationship within the home.

F.3d 489, 491 (8th Cir. 2013) (quoting *Nimick v. Sec'y of Health & Human Servs.,* 887

F.2d 864, 866 (8th Cir. 1989) (emphasis in original).  However, an ALJ "may discharge

this duty by referring to the specific job descriptions in the *Dictionary of Occupational*

*Titles* (DOT) that are associated with the claimant's past work." *Young*, 702 F.3d at 491.

The ALJ failed to make explicit findings regarding the physical and mental

demands of Olson's prior work and compare those demands with the RFC as required by

SSR 82-62.  The ALJ states in his decision that he compared the physical and mental

demands of Olson's past relevant work with his RFC before determining that Olson could

perform past work.  But it is unclear what evidence the ALJ relied upon when making

this assessment.  As to the delivery driver job, Olson testified that he would load up

different parts in the back of his truck and drop them off at different locations.  He "could

be lifting , . . . depending on what part, . . . up to 100 pounds." [Tr. 42].  As to the truss

building job, Olson testified that he would have to lift a maximum of fifty pounds and

that he would put pieces of wood together "like a puzzle piece" and secure them using a

press.  [Tr. 45].  However, there is no testimony from Olson regarding what if any upper

extremity manipulation was required for either of these jobs.  Nor was there testimony

regarding the mental demands of the past jobs.  These findings are necessary because

Olson alleges manipulative and cognitive impairments.  *See Gump v. Barnhart*, 334

F.Supp.2d 1155, 1163-64 (E.D. Mo. 2004) ("Although the ALJ elicited testimony that

plaintiff was not sure how much she lifted or carried at Tracker and that the amount was

'maybe five pounds,' the record does not indicate whether this was the greatest weight

she lifted or the amount she lifted occasionally. Even though she testified about some

details of her work at Tracker, she made no mention of the mental demands of that work or of other exertional demands of that work and the ALJ failed to make explicit findings regarding the physical and mental demands of such work.").

Next, the Commissioner argues that even if the ALJ did not make explicit findings regarding the demands of Olson's past work, the ALJ was discharged from that duty because he "relied on . . . the VE's testimony at the administrative hearing and reliance on the DOT's classification to conclude that Olson could perform his past relevant work . . . ." [Doc. 8, p. 13]. However, neither in his decision nor in his examination of the VE did the ALJ identify Olson's past work by referring to the specific job descriptions in the DOT. Unlike in *Young*, where the Eighth Circuit determined that the ALJ had discharged his duty to make explicit findings related to the claimant's past relevant work, the ALJ did not "expressly refer to the DOT in his decision" or state that Olson was capable of performing work as it was described in a specific DOT classification. *See Young*, 702 F.3d at 491-92. Nor did the VE identify the specific DOT classifications for Olson's past jobs. The ALJ made the conclusory statement that the VE's testimony was consistent with the DOT, but because neither the VE nor the ALJ ever identified which DOT job descriptions were assigned to Olson's past relevant work, it is unclear how the ALJ can be certain that the VE's testimony is consistent with the DOT.

The Commissioner also contends that even if the ALJ's decision that Olson could perform his past work as actually performed is not supported by substantial evidence, remand is not required because the ALJ also determined that Olson could perform past work as it is generally performed in the national economy. "Where the claimant has the

20

residual functional capacity to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled." *Lowe v. Apfel*, 226 F.3d 969, 973 (8th Cir. 2000). While the ALJ states in his decision that the VE testified that a person with the same RFC as Olson could perform work as a truss builder and delivery driver as generally performed, [Tr. 24], it is unclear from the VE's testimony whether the VE was testifying as to Olson's ability to perform the jobs as he performed them or as they are generally performed. After the ALJ asked the VE to classify the skill, exertional, and SVP levels of Olson's past jobs and after the ALJ described the RFC to the VE, the VE testified, "In my opinion, claimant could perform the truss building job, the delivery truck driver job." [Tr. 66]. There is no distinction from the VE regarding whether her opinion is based on how the jobs were actually performed or how they are generally performed.

Further still, the hypothetical presented to the VE does not clearly identify whether a push or pull limitation exists. The ALJ stated that the hypothetical person could

> Lift and carry 50 pounds occasionally, 25 pounds frequently. They could stand or walk six hours in an eight hour work day. They can sit six hours in an eight hour work day. They can push or pull – no limits given for lifting and carrying – occasional fine manipulation with both hands, frequent manipulation with both hands . . . .

[Tr. 66]. In the hypothetical, the ALJ started to list a push and pull restriction, but did not finish the restriction before moving to manipulative restrictions. However, in the ALJ's decision, the ALJ determined that there was a push and pull restriction: 50 pounds occasionally and 25 pounds frequently. [Tr. 20]. It is unclear whether the VE's

testimony that Olson could perform work as a truss builder and delivery truck driver – either as actually performed or generally performed – was based on the RFC the ALJ ultimately adopted for Olson, which included a push and pull limitation.

On remand, the ALJ shall specifically identify Olson's past relevant work by the DOT classification or make specific findings related to the physical and mental demands of his past work consistent with SSR 82-62. If the ALJ chooses to utilize the testimony of a VE, the ALJ shall make clear whether the VE is determining whether Olson can perform his past relevant work as he performed it or as it was generally performed.

### F.  Whether Jobs Discussed at Step 5 are Precluded by the RFC

The Commissioner argues that even if the ALJ's determination that Olson could perform past relevant work was not supported by substantial evidence, the error is harmless because the ALJ alternatively determined that Olson could perform work as an industrial painter, landscape specialist, and electrician's helper. Olson argues that he cannot perform the jobs identified by the VE because they require frequent handling, and he is limited by the RFC to only occasional fine manipulation. However, there is no handling limitation within the RFC, and while each of the three jobs requires frequent handling, they require only occasional fingering. Olson's complaint is that the fingers in his left hand are numb and that he struggles with fine manipulation. Therefore, the ALJ's determination that Olson could perform jobs with frequent handling but only occasional fingering is consistent with the occasional fine manipulation limitation in the RFC.

Nevertheless, because the ALJ's credibility, medical opinion, and third-party statement analyses are not supported by substantial evidence in the record, the

hypothetical presented to the VE by the ALJ is likewise not supported by substantial evidence.  As a result, the ALJ's reliance on the VE's testimony to determine Olson could perform other jobs that existed in significant numbers in the national economy, where the VE's testimony was based on that hypothetical, is not supported by substantial evidence.  After reassessing Olson's credibility, the medical opinions, and the third-party statements in the record, the ALJ shall, if necessary, form a new RFC and utilize the expertise of a VE to determine if Olson can perform past relevant work or other work that exists in significant numbers in the national economy.

## III.   Conclusion

For the reasons set forth above, the Commissioner's decision is reversed, and the case is remanded for further consideration consistent with this Order.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  March 30, 2015
Jefferson City, Missouri